## THE NEW YORK CENTRAL TUG NO. 27.

(District Court, S. D. of New York. March 11, 1924.)

1. **Collision ⬧106—Passing of tug and steamship backing from slip held cne cf special circumstances.**

   The passing by a tug with a car float going down North River of a steamship backing from her slip on the Manhattan side *held* one of special circumstances, and not of the starboard hand rule.

2. **Collision ⬧96—Tug with tow alongside held in fault for collision with steamship backing from slip.**

   A tug with a car float alongside, passing down North River in the daytime, *held* in fault for collision with a large steamship backing from her slip on the New York side to proceed to sea, though her stern had passed some 400 or 500 feet beyond the middle of the channel, where the conditions of wind and tide were such as to make that probable, and she could have been seen backing by the tug for six or seven minutes before collision, and in time to allow her a wider berth, but the tug had no lookout and did not see her until she was within 800 or 900 feet.

In Admiralty. Suit for collision by the White Star Line, owner of the steamship Cedric, against the New York Central Tug No. 27. Decree for libelant.

This cause comes up for final hearing upon a libel filed by the White Star Line against the New York Central tug No. 27, because of a collision between the tug's loaded car float and the libelant's steamer, Cedric, on March 6, 1920, in the Hudson river, between 800 and 1,200 feet off Castle Point. The tide was at the first of the ebb, and the weather was clear, but there was a gale blowing from the northwest. The tug started out at 12:04 p. m. from the Weehawken bridges, with the car float on her port hand, bound down stream. The car float was 334 feet long, and the tug about 100. She held her speed until after the collision, which happened between 12:18 and 12:20, as fixed by the engine log of the Cedric. The distance from the bridges to the place of collision is 10,200 feet, or slightly less than 1¾ knots. When not more than 400 or 500 feet away the tug ported, and afterwards hard aported

and nearly cleared the stern of the Cedric; the contact being between the port quarter of the car float about one-third of her length forward of the stern, and the rudder of the Cedric, which was at the time to starboard. The collision only ripped off some of the side strip of the float, but quite broke the steamer's rudder at the post, thus making her entirely helpless.

The Cedric had been lying on the south side of Pier 61, bows in, ready to back out and proceed downstream to sea. At 12:12 she was cast off, and both engines put astern; the starboard at full speed and the port at half. After a period of less than a minute her port engine was put full speed astern and continued for two minutes, when it was slowed down to half speed, and stopped at 12:16. It was immediately put full speed ahead, at which speed it continued until after the collision. At 12:18 her starboard engine was stopped, put slow ahead, and full speed ahead; the three changes being ordered close together. Whether both engines were going full speed ahead at the time of the accident is in dispute.

Two assisting tugs were upon the steamer's starboard quarter to hold her up against the wind. Nevertheless, as she backed out, the wind and tide caught her stern, which began to cant downstream. One of the tugs then went around on her port bow; the other remaining at her starboard quarter. So she backed into the stream, drifting down with the wind and the ebb tide, to the place of collision, opposite Pier 57 on the Manhattan side. Though her stern had crossed the thread of the river by 400 feet or more, she was still headed about two points upstream. Whether she actually had sternway or not at the moment of collision is in dispute.

The signals of the tug were two single whistles at intervals. The Cedric blew a slip whistle while starting and a backing signal, and later another slip whistle and two backing signals, at which last signals her nose had cleared the pier end.

The tug had no lookout. There was a man cleaning brasses in the pilot house, and a float man, who was engaged about the cars. The steamer had upon the bridge a Sandy Hook pilot, who was in charge, the captain, two officers, a petty officer, three quartermasters, and a Boy Scout. On the after bridge were the first and third officers and a quartermaster.

Chauncey I. Clark, of New York City, for the Cedric.
T. Catesby Jones, of New York City, for the tug.

LEARNED HAND, District Judge (after stating the facts as above). Both sides concede that the Cedric's damages are so heavy as to exceed the value of the tug, even if both ships were at fault. In consequence I shall not consider any supposed fault of the Cedric, except in so far as it is involved in determining the fault of the tug. If the latter is at fault at all, the other question is moot; the libel being in rem.

[1] The Servia, 149 U. S. 144, 13 Sup. Ct. 877, 37 L. Ed. 681, is the nearest controlling case, and I shall start with its consideration. It settles the law that the case is one of special circumstance, and not of the starboard hand rule. The Noordland, which was there held solely at fault, was backing out from her Jersey City pier at a place where the river was 4,400 feet wide. She was less than 400 feet long, and had gone across the river so far that the collision, which was at her very stern, took place only 800 to 1,000 feet from the New York pier ends. As a consequence her bows, even if she was athwart stream, were over 3,000 feet from the New Jersey shore, a distance unnecessary for her proposed navigation. There is no mention in the report of any disturbing condition, such as the wind was in the case at bar.

The Noordland, having come out so far, signaled to the Servia, which was coming down the river as near the Manhattan piers as she safely could, that she would starboard and go ahead. Her engines were

stopped, which the Servia saw, though she did not hear her signal. Supposing that the Noordland would execute her apparent purpose, the Servia kept on until it was too late. The collision occurred because the Noordland did not at once put her engines ahead, but continued to make sternway "at considerable speed," which thus brought her unexpectedly across the Servia's bows.

The Noordland's faults were in backing further across the stream than was necessary, in failing after giving her signal to check her sternway soon enough, and in not keeping a good lookout. These two faults deceived the Servia in her expectations, based upon the common usage of steamers, and justified her supposition that she might safely continue her course without change of speed. She was held free from fault, because she had given the Noordland a wide enough berth, had the latter done what it was reasonable to suppose that a steamer so situated would do.

[2] The case, in spite of superficial similarity, due to the position of the vessels and their respective navigation, does not seem to me to be of much service in the case at bar. The river is only about two-thirds as wide at the place of this collision, and the Cedric was nearly twice as long as the Noordland. The wind was such that the Cedric, still canted upstream, had less than two lengths, instead of over seven, from her bows to the shore. Whether or not she had put her starboard engine ahead before the collision, as I believe she had, she did not stop backing and then wait. The port engine, which was that visible to the tug, had been full speed ahead for from two or three minutes before the collision, and the starboard engine was put ahead at once after being stopped. She kept a good lookout, and did not by her movements deceive the tug. The tug had no reason, as I shall try to show, to suppose that the Cedric would not back as far across as she did; that being reasonably necessary to turn her. The tug's navigation was, it is true, more difficult than the Servia's, and that should count in her favor; but it serves as an added distinction between the cases, and makes the result, as is usual in special circumstances, dependent upon the particular situation which existed at the time.

As I view the case, the tug's fault must depend, first, upon whether she had timely warning that she should port earlier and give the Cedric a wider berth; and, second, whether there was anything to prevent her doing so. The first question depends upon whether the Cedric backed further than was within reasonable expectation. I believe that she did, indeed, back a good bit further into the stream than was customary or necessary in calm weather or on a flood tide. I do not believe the stories of the watermen that her navigation was an egregious and unpredictable occurrence, to be associated with the classic lunge across stream of the Leviathan. In support of this conclusion I rely upon the width of the river and the weather. The Cedric's stern had been caught by the gale as it left the piers and swung downstream, so that she was canted upstream probably more than two points. In spite of the helper tugs, of a starboard helm, and of the fact that for two minutes her port engine had been going full speed ahead, and for six her starboard engine had been backing, she had not much corrected her heading. **At**

298 F.—61

least, she was still canted upstream about two points, which shows that it was difficult to turn her that day. She had only 1,100 to 1,200 feet in which to port 10 points. 1 do not believe, considering the much larger steamers weekly making in and out of this harbor, that it was entirely exceptional for a ship to go so far into the stream. It must be frequently necessary under adverse conditions, and so the libelant's witnesses aver.

Moreover, the claimant's testimony on this phase must be taken cum grano. The harbor was hostile, I think, to this outlander, one of those monsters which are perpetual nuisances, blocking the fairway to the trepidation and impediment of honest folk making a hardearned living. Therefore I ignore the sensational description of the movement given by some of them, and I hold that, given the wind and tide, it was not unheard-of navigation, or beyond all expectation. A great port must not impose vexatious restrictions on the commerce which seeks its wharves, nor a sea court take sides between those who ride the deep and shallow waters. And so I charge the tug, when she saw, or should have seen, the Cedric, as she emerged from the pier, with notice that she might have to back out 400 or 500 feet past midstream in order to make her turn. Whatever was necessary and possible to avoid her the tug was in reason bound to do; the steamer was the embarrassed one of the pair, and should have been treated as such, unless the tug's safety would be compromised by doing so.

The Cedric cast off at 12:12 and made out into the stream. She must have been visible by 12:13, even though the gale killed her signals, so far to windward as the tug was. Where was the tug at that time? That depends upon when the collision occurred. The testimony of the ship is uniform that it was after the starboard engine was put ahead at 12:18, and I think that this is corroborated. In the first place, she was stopped at once after the collision, and this was at 12:20. It took some time for the after-bridge to report and the bridge to telegraph the engine room, but it was probably not more than a minue in all. If I take the collision as at 12:19, I have the tug 15 minutes under way before the collision. From the West Shore bridges to Castle Point being 10,200 feet, the tug's speed comes to 6⅘ knots over land. It certainly was not greater than that; indeed, the result strongly suggests that the collision happened at 12:20, which makes her speed 6⅓ knots, close to Taylor's own estimate.

Let me assume, even, that it was 6 knots, though I cannot admit it. If so, then at 12:13 the tug, which was 6 or 7 minutes away from the place of collision, was about 4,000 feet upstream; that is, she was off Weehawken Cove and over half a knot away from the end of Pier 61 in a direct line. From that moment Taylor must be charged with accommodating his navigation to the probable navigation of the steamer. Any assumptions which he incorrectly made as to just how far she would back were at his peril; in fact, her movement was no greater than reasonable prudence would have allowed for. But Taylor made no mistake and no miscalculation, because he was not on the alert and did not see the steamer at all. The absence of lookout is admitted; his own inattention he himself conceded. He says that he did not see the steamer till she was clear of the pier and out in the stream, some 800

or 900 feet away from him. He was then scarcely more than a minute and a half from collision, and perhaps it was already too late. His candid admission that he might have been looking to the New Jersey side, or that he had been paying no attention to the steamer, adds nothing to the bare facts. Here, then, was the first fault, and one so often condemned in this district that I might stop with it. The tug had no lookout, and relied on the master, who could not cover both sides of the river, and ought not to be expected to. It is a time-worn fault, for which vessel after vessel has been condemned.

The claimant argues that, granting Taylor was inattentive, it made no difference, because he was so situated that he could have done nothing anyway; the river off the New Jersey piers being too full for him to port further to the westward and give the Cedric an adequate berth. There were two vessels bound upstream and below the Cedric; that is, the Jameson and the Dover, each with a tow alongside. Perhaps there was also a Jersey Central tug. Their distances from the pier ends is in some dispute. Taylor says that three vessels were strung out astern of each other, between 100 feet and 200 feet off the pier ends. Cox, of the Jameson, says that he was 800 or 900 feet out from the pier ends, but does not place the Dover, except to say that he passed her when she was more than 200 feet out in the stream. Maxwell, of the Dover, says that he was 100 feet offshore and the Jameson 200 or 300 feet outside of him. No one but Taylor appears to have seen the Jersey Central tug, and I doubt that it was there. If so, it added no obstacle to the tug's movements.

I do not care whether one accepts the story of Taylor and Maxwell that the tows were coming up 300 or 400 feet off shore, or that of Cox that between them they took up the space between the Cedric's stern and say 400 feet from the pier ends. I believe it far more likely that both tows were hugging the New Jersey shore, as near as might be, to keep out of the gale and avoid the ebb, which had begun to set, at least in midstream. If Maxwell and Taylor be right, the tug, which needed only 100 feet, had 400 feet of clear water nearer shore, even if the collision happened only 800 feet off Castle Point, and as much more as it was out in midstream. If Cox is right, which I doubt, for the reasons I have given, then the tug, had she acted in time, could have pulled in still further to the shore, crossing the tugs' courses in safety far above them. It was not necessary to stop, slow, or back; it was necessary to keep a lookout and make out the steamer before she was 800 or 900 feet away.

Given the fact that the steamer's navigation was not so unusual as to be outside of reasonable calculations, the tug's fault is amply proved. Unusual I have conceded that it was, but I find that it was not so unusual that a tug might hold her course on the assurance that she would not have to count with it. It seems to me on the face of it unreasonable to say that a powerful tug, with a single float, with clear water on her starboard hand, should be excused for fouling a steamer backing out so slowly as the Cedric, which had in 7 minutes come out no more than 2,000 feet from the Manhattan shore. Such a thing cannot happen, if the tug be properly handled and her crew be watchful.

Decree for the libelant.