## The BULLEY.

(Circuit Court of Appeals, Second Circuit. January 5, 1925.)

No. 112.

Collision ⚖=93—Tug, which collided with tow of tug after crossing its bow, held at fault.

Tug, which was proceeding against tide, bound for wharf, on port bows of two others with following tide and hawser tows, and which by agreement crossed bow of one of them and collided with boat in its tow in avoiding the third tug, *held* solely at fault, since it was burdened vessel and could have stopped, while third tug could not slow up or stop in safety.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Mesick & Mesick, Inc., against the steam tug Bulley, her engines, etc., claimed by Owen McCaffrey's Sons, James C. Davis, as Director General, etc., and another. From a decree for libelant against James C. Davis, as Director General, etc., he appeals. Affirmed.

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for libelant-appellee.

Park, Mattison & Lynch, of New York City (Samuel Park and Anthony V. Lynch, Jr., both of New York City, of counsel), for the Bulley.

Bigham, Englar & Jones, of New York City (A. J. McElhinney and L. J. Matteson, both of New York City, of counsel), for Director General.

Courtland Palmer, of New York City, for the Socony No. 4.

Before HOUGH and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge. On a fair day and with a strong ebb tide under foot, tug Bulley, with eleven light boats, in four tiers, on a hawser of about 20 fathoms (making the flotilla between 500 and 600 feet long), was going down the East River between Manhattan and Blackwell's Island.

Simultaneously tug Socony No. 4, with two light barges (in all 60 feet wide), abreast on a hawser of 30 fathoms, was going the same way, but at much higher speed. Both of these tugs had tows on hawsers with a following tide—stopping would involve danger to both tug and tow.

At the same time tug Athens, with two floats lashed on her port side (making a flotilla 100 feet wide), was proceeding in the

other direction, and against the tide, bound for a wharf on the Manhattan shore. She had come from Jersey City, and her story of what the other tugs did and her own conduct in relation to them begins when having come up the East River on the Brooklyn side, she turned "just below Newtown creek" and "headed over towards Forty-Third street, Manhattan."

This made her the burdened vessel in respect of vessels coming down with the tide, and having Athens on their port bows, and this was the situation in respect of both Bulley and Socony No. 4.

When off Thirty-Seventh street, Manhattan, Athens blew two whistles to Bulley, the latter tug assented, and drew off to her own port hand. There was a fairly strong northwesterly wind, but the immediate effect of the Bulley's starboarding her helm was to leave her tow somewhat on her own starboard quarter.

When Athens blew two whistles off Thirty-Seventh street, Bulley was between Forty-Seventh and Forty-Ninth streets in the opinion of Athens' master; while Socony was close to the end of Bulley's tow and was there seen by said Master, who, however, "did not figure" on Socony "at all when I blew the two whistles."

Substantially at the same time as Athens gave Bulley the two whistle signal, Socony blew once to Bulley to signify her desire to overtake to starboard, and Bulley answered with one. We find this as a fact, although the evidence about whistles is in some confusion; because the exchange between Socony and Bulley is we think proven and the masters of Athens and Socony, who agree in little, do agree that the latter tug blew to Bulley when Bulley was about off Forty-Seventh street, i. e., just where Athens places Bulley when she began the two whistle exchange.

Thus Athens asked and obtained permission from Bulley to pass the latter's tow, just as the former tug's navigator heard Socony announce her intention of overtaking and passing the Bulley.

Result was that Athens crossed Bulley's bow, found it impossible to do the same with Socony, tried to pass between the latter vessel and Bulley's tow, and collided with libelant's boat which was in said tow.

The lower court found Athens solely at fault, and we agree.

Regarded from the standpoint of rules of navigation, Athens was the burdened vessel on a crossing course, and she failed in her duty of keeping out of Socony's way.

Regarded as a case of special circumstances, in that Athens was manoeuvering for a landing place, that tug attempted the impossible, and, as the lower court correctly put it, "ran herself into a pocket."

Looking at the matter as one of management or watermen's skill, the Athens saw, or had opportunity of seeing, where both Bulley and Socony were and what they were doing and likely to do. For her it was easy to slow, and when off Thirty-Seventh street she had room to stop without injury to herself or her floats; while it is obvious that Socony could do neither in safety with a hawser tow and a following tide.

This appeal is based on the proposition that Socony has no right to overtake Bulley and her tow. That was a matter for arrangement between those two tugs, and it was arranged satisfactorily to both. Athens cannot complain when she made no timely objection; and finally her right to complain vanishes when we say that the evidence convinces us that with better management Athens and her floats could have passed safely through the open water between Socony and Bulley's tow.

Decree affirmed, with interest and costs.