474

NORTH & EAST RIVER STEAMBOAT CO.
v. JAY STREET TERMINAL.

THE WILLIAM A. JAMISON.

JAMISON et al. v. NORTH & EAST RIVER
STEAMBOAT CO.
THE CITY OF STAMFORD.
Nos. 162, 163.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1931.

The opinion of INCH, District Judge, is as follows:

The owners of the steamship City of Stamford has sued the tug Jamison and her owners. The owners of the tug Jamison has sued the steamship City of Stamford and her owners, all on account of a collision between the City of Stamford and a car float being towed at the time by the Jamison. The two suits were tried together. The facts are the same in each suit. One opinion is sufficient.

There is little dispute as to the facts except in one or two important particulars.

I find that on the night of November 19, 1925, the steamship City of Stamford left Stamford, Conn., bound for pier 30, East River, Manhattan side, New York City. The City of Stamford, which I shall hereafter refer to as the Stamford, is a Sound steamer, 150 feet long, 35 feet 6 inches beam, and carried a cargo of general merchandise. At the time in question, Van Dyke, her captain, was at the wheel. The pilot, Skidmore, was also in the pilot house. There was no lookout at the bow; Van Dyke stating that such place "would be the poorest place to put him." I am not satisfied that there was any special lookout at any place. Van Dyke and Skidmore evidently considered that they could have seen, and did see, all that was necessary.

The Stamford arrived at a point in the East River, above the Manhattan Bridge, about 2:30 in the morning of November 20th. The night was clear. There was only a light wind. There were no unusual circumstances. The tide was strong ebb, and the Stamford had it under foot.

As the Stamford thus came down with the tide, and had reached "just on the upper side of Manhattan Bridge, heading right straight down the river," somewhat on the Brooklyn side of the stream, Van Dyke and Skidmore saw, about 2,000 feet away, the lights of two tows. The running lights on the tug of the tow nearest the Brooklyn side of the river could be clearly seen. This turned out to be the tug Jersey Central, with two car floats in tow, one on each side. Only the staff lights and "some low white lights" on the other, or inside tow (the Jamison), were seen at that time, and Van Dyke said to Skidmore "I guess that fellow on the inside is going down."

Both the tugs and tows were inside the Stamford. The passing indicated was starboard to starboard.

Thereupon Van Dyke blew one whistle to the only tug he supposed was coming up. This was the Jersey Central. The Jersey Central answered with one whistle. No whistle was blown to the Jamison nor did the latter blow any.

While the maneuver indicated by this one whistle from the Stamford was a dangerous one, under the circumstances, still there was room for the Jersey Central to avoid collision, as she had plenty of water on her starboard side. This condition did not apply to the inside tug Jamison, which was at that time overtaking the Jersey Central. Both the Jamison and the Jersey Central had the strong ebb tide against them.

Shortly after this exchange of whistles between the Stamford and the Jersey Central, and approximately at the same time, the Stamford made a wide sheer to her starboard in order to go in to pier 30. This brought the Stamford directly across the bows of both the Jersey Central and the Jamison. It was a careless thing to do. The Californie and McAllister (C. C. A.) 250 F. 790, 792; The Black Diamond (C. C. A.) 242 F. 930; The Bulley. (C. C. A.) 4 F.(2d) 1004; The Dauntless (C. C. A.) 3 F.(2d) 529; The Morristown (C. C. A.) 278 F. 714; The Munaires (C. C. A.) 1 F.(2d) 13.

The captain of the Jersey Central, upon getting this whistle from the Stamford, and having room, "put his wheel to port to give the Stamford all the room possible to swing on account of the strong ebb tide." By this maneuver he was able to pass under the stern of the Stamford, but apparently it was quite close. No such room was afforded the Jamison.

When the Stamford had executed this starboard sheer or turn, and was about broadside to the river, Van Dyke saw, as he claims for the first time, the green running light of the Jamison, the inside tug, coming up. The two boats were then about 300 feet apart. The Stamford was also being carried somewhat down by the ebb tide. Van Dyke then made what I consider another mistake. Instead of continuing his course, however wrong it was originally, he stopped, blew an alarm, and ordered his engines full speed astern. This took what little chance there was away from the Jamison. Her car float, towed on the tug's port side, collided with the Stamford, about 25 feet from the Stamford's stern. It was somewhat of a glancing blow,

and the Jamison and her car float subsequently passed along and under the stern of the Stamford.

This stopping and backing maneuver of the Stamford alarmed Van Dyke for the safety of even the Jersey Central tug and her tow, for, he testifies, that, as soon as such order was given, he "jumped out of the pilot house and went to the side of the Stamford to see that he did not back into" the Jersey Central.

The liability of the Stamford seems to me to be clear.

The remaining question is whether or not there is liability on the part of the Jamison.

The witnesses for the Stamford say that they did not see any running lights on the Jamison at any time until the collision was inevitable, and then saw only her green light. They did see the staff lights long before, but jumped to the erroneous conclusion that the Jamison was going away from the Stamford.

The captain of the Jersey Central says that he did not see any port light on the Jamison, although he says he saw her staff lights and the green light.

I am satisfied that all the regulation lights of the Jamison and her tow were burning.

The seeming conflict between the testimony of the captain of the Jamison as to these lights and some of the other witnesses can, it seems to me, be reasonably reconciled. The Jamison and her tow at first were practically "under the stern" of the Jersey Central. This accounts for the failure of those in charge of the Stamford, with their imperfect lookout, to discern her true course. The Jamison was overtaking the Jersey Central. After the captain of the Jersey Central had blown his one blast whistle, and was naturally attending to the dangerous maneuver of avoiding the Stamford, the Jamison had come up on the Jersey Central, and, instead of passing on her starboard side, was passing on her port side, owing to the fact that the Jersey Central was swinging to the starboard. This, it is reasonable to assume, was when the captain of the Jersey Central became really interested in the Jamison, and at this time only the latter's green light would be visible to him.

The captain of the Jamison swore that all his lights were burning.

We have in addition the disinterested testimony of Ford, captain of another tug. He was clearly in a position to see, as his tug was on the Manhattan side of the river, and he

could see the entire transaction. Ford testifies: "I saw the port light of the Jamison and it was burning bright. I could see it clearly." He also testifies that he could not see the Jamison's green light.

It is plain, therefore, that there was no fault in regard to lights on the part of the Jamison.

There was, however, in my opinion, fault on the part of the captain of the Jamison in thus insisting upon coming ahead, with all the circumstances of danger clearly before him. It was a clear night. He had heard the Stamford giving a wrong and dangerous signal. He had heard the Jersey Central accept. Yet he did nothing to prevent the collision. Instead, he kept "hooked up," and was even passing the Jersey Central, plainly in the hope that he might possibly slip by, especially if the Stamford kept her course across the river. Instead, the Stamford, as we have seen, stopped, backed, and from then on Ford is right when he testifies that he heard the Jamison then blow an alarm, but that the captain of the Jamison tug "couldn't have done anything that I could see in order to avoid collision."

This was true after the Jamison had deliberately got herself into the dangerous place. However, the ebb tide was against the Jamison. Her captain, therefore, knew that the Stamford had the ebb tide with her. He saw exactly what was taking place and what was likely to take place, and all he had to do was to slow down and there would have been no collision. Instead of that, he kept on. This was a careless act. The Socony No. 19 (C. C. A.) 29 F.(2d) 20.

Accordingly, I find both the Stamford and the Jamison equally at fault, and the damages should be divided. Decree for libelants for half damages.

Courtland Palmer and Palmer & Furman, all of New York City, for claimant appellant and cross-libelants appellants.

Horace L. Cheyney and Macklin, Brown, Lenahan & Speer, all of New York City, for libelant appellant and claimant appellant.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

PER CURIAM.

Affirmed on opinion below.