## THE PORT NEWARK.
## THE AKRON.

District Court, E. D. New York.
April 14, 1932.

Alexander, Ash & Jones, of New York City (Max Taylor, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for claimant steam tug Port Newark.

Park, Lynch & Hagen, of New York City (C. W. Hagen, of New York City, of counsel), for claimant steam tug Akron.

INCH, District Judge.

Libelant owns the scow Empire 16. The tug Port Newark is owned by the Newark & New York Tow Boat Company. The tug Akron is owned by the Erie Railroad Company.

About 4:30 o'clock, in the afternoon of October 17, 1929, a car float, in tow of the tug Akron, collided with libelant's scow while said scow was in tow of the tug Port Newark. Libelant has sued both tugs.

There is no question but that libelant is entitled to recover from one of these tugs or possibly both. This is the question that remains to be decided. Briefly the facts are as follows:

The scow, at the time in question, was light. She was about 120 feet long, 37 feet wide. The tug Port Newark was towing this scow astern on two short hawsers about 30 feet long, one from each corner of the scow. The tow was bound for the Cornell stake boat in the North River.

The master of the scow did not see the collision, as he was then sitting in his cabin. The first he knew anything was wrong was when he felt the shock of the collision. His brief testimony was taken by deposition.

As is usual, the captain of each tug blames the accident on the other. Under such conditions there is a somewhat unusual agreement on the facts. The afternoon was clear, visibility good, tide ebb, and the captains of both tugs plainly saw each other for a considerable distance. There is slightly more dispute that a very strong northwest wind was blowing, a fair estimate being 40 to 45 miles an hour. This likewise was known to both captains.

On the Jersey side of the river were the Erie Railroad ferry slips; dock 4 being the northerly side of these slips. Alongside this dock, together with other boats, lay the car float 43. This car float is one of the very large steel car floats. It is 360 feet long; had double tracks; its full load is 16 cars. At the time in question it had on board 8 tank cars, light, all located near the bow.

Schultz, the captain of the Erie tug Akron, had received orders to go in and take this car float 43, with its load, down the North River to Staten Island. He accordingly maneuvered his tug into the slip and alongside the 43 and took her on the starboard side of his tug. He placed a proper lookout at the stern end of the float. There was also a floatman on the float at the stern. The Akron blew the proper slip whistle.

This lookout, after looking up and down the river, gave the signal, and the Akron proceeded to back out of the slip.

While there is some discussion as to whether or not the car float should have been taken on the port side of the tug instead of the starboard side in view of the weather conditions, there was nothing unusual in the maneuver contemplated, to wit, backing out into the stream, swinging the bow of the car float around by backing the tug, after first straightening up, and then proceeding down near the middle of the river with the tide under foot. This is done every day, and both captains of these tugs were thoroughly familiar with this practice.

While the Akron was thus backing out with her large car float, which naturally extended considerably beyond the tug's bow and stern, the tug Port Newark was coming up the North River about 500 feet off the pier ends with libelant's scow in tow astern as already indicated. In the wheelhouse of the Port Newark was her captain, Begley, and beside him was his deck hand. Both of these men saw the Akron and what she was doing while they were as far down the river as 1,200 feet away. Both the tide and the wind were against the Port Newark, and she was proceeding full speed ahead at about 3 miles an hour.

Near the center of the river, with a car float on each side, and about opposite the slips in question from which the Akron and her car float were thus emerging, lay a Bush Terminal tug waiting for orders from the shore as to where his car floats were to go. About the time the Akron started out, these orders had been received by the Bush, and he thereupon blew a whistle to the Akron

which the Akron answered. So far as I can see, the presence of this Bush Terminal and her tow becomes immaterial, for she subsequently and considerably before the collision in question proceeded without incident into her proper slip with her tow.

There was nothing therefore about the presence of this tug, under the circumstances, which tended to affect the navigation of either of the other tugs.

The tug Fort Newark neither changed her course, nor her speed, but proceeded to approach the Akron backing out of the slip with this large car float on her starboard side.

The Akron came out and straightened up at right angles to the piers, bow up the river. She then proceeded to turn her float around, as indicated, in the usual manner. The ebb tide set the Akron tow slightly down the river as was to be expected. The effect of the wind, however, caused the float and tug to circle somewhat more widely than would otherwise have occurred.

I find no evidence that the tow was out of control, but I do find that the wind affected the maneuver.

In the meantime the Port Newark, although all this was going on in full view of her captain, made no effort to slow down or even stop, as he could well have done without injury to his tow or even inconvenience thereto.

When the Port Newark was about off Dock 2, which is about the south side of the ferry slips, Schultz, captain of the Akron, became alarmed and testified that he blew an alarm whistle as well as a backing whistle. The dispute over this fact is not important, for the reason that the emergency had then become so plain that, even if there had been a failure to blow a certain kind of whistle, it could not be considered a proximate cause. The car float of the Akron continued to swing around, and, as she did so, the Port Newark put on extra speed and endeavored to clear the float by going to the starboard, and came very near to doing so.

However, the scow and float collided at a point about 40 feet from the bow of the car float. Naturally the scow was damaged. The Akron and her float then proceeded down the river.

There is some dispute about the place of this collision in the stream. Begley, captain of the Port Newark, says it took place about off the middle of the ferry slips, six or seven hundred feet out. His deck hand says the same thing.

Schultz, captain of the Akron, considering both direct and cross examination and remembering that the scow was 360 feet long, says that it was about 600 feet, and that he was 100 feet from the end of the dock.

Baker, deck hand of the Akron, who was acting as lookout on the stern of the car float, on direct states that the stern "was so close to the dock that I was getting ready to holler to the captain. It was about 35 or 40 feet." But on cross he likewise states "we were about 100 feet out from the pier and then the bow fell off towards New York.

In my opinion therefore, the place of the accident was off the middle of the ferry slips in the neighborhood of 600 feet from the pier heads.

There is testimony that the swinging of such a car float, under normal circumstances, could be made in less, Baker testifying "ordinarily we could turn in 400 feet. We frequently do."

Consequently I find that the tug Akron and her car float did not go down the stream any unusual distance, and that possibly she swung 200 feet wider on account of the strong wind than she ordinarily would have done. The Akron had a right to come out with her tow and execute this usual maneuver, provided she did so reasonably and without careless interference with other vessels in the vicinity.

As has been said in regard to this backing privilege, "it is no more possible to define in yards than it is to extract a meaning from the word 'reasonable,' that will serve as a rule of conduct applicable to all cases irrespective of attending circumstances." La Lorraine (C. C. A. 2d) 12 F. (2d) 436, 437. See, also, the case where, on account of conditions of wind and tide, a large vessel backed out a considerable distance beyond the middle of the channel, yet without fault. The New York Central Tug No. 27 (D. C.) 298 F. 959, opinion of Judge Learned Hand.

Considering the width of the river and all the other circumstances, I see nothing unreasonable in the action of the tug Akron.

Of course, as has been said: "It is nearly always so, that some criticism can be made upon the navigation of vessels engaged in a collision." The William Tracy (C. C. A.) 172 F. 922, 923.

But such criticism here would not show the "proximate cause" for the collision, for,

had the tug Port Newark been navigating carefully, the accident would not have occurred. "In our opinion, had she been moving at moderate speed, appropriate to such crowded navigation, there would have been no collision." The Newark (C. C. A.) 289 F. 801, 802.

This brings us to the navigation of the Port Newark. As I have said, the captain of the Port Newark, which was proceeding, with her tow, about 500 feet off the pier heads, saw the Akron backing out when he was 1,200 feet down the river. Captain Begley testified: "I have often seen car floats coming out of these slips. The Akron came out with her car float and straightened up and down the river. I assumed they were going to remain in that direction." "I had assumed she would stay."

Nevertheless, the Port Newark kept on coming at full speed, and was about 800 feet away when she heard the exchange of whistles between the Bush tug and the Akron, which likewise must have indicated plainly to her what was happening.

Even at this distance he did not give time to the Akron to complete her maneuver, interfered with by the wind, although, according to his deck hand, who was standing beside him at the wheel, "the Akron and her tow remained straightened up a short while then she turned to the starboard and came further out. We pulled still further out."

How this testimony agrees with said "assumption" of the captain is unnecessary to say. The fact is that the Port Newark could well have stopped or at least slowed down and avoided the collision. On the contrary, according to this deck hand, "we were going full speed all the way up and then when we saw what was going to happen we went still faster."

The captain of the Port Newark was thoroughly familiar with this river and its traffic. He well knew the strong wind that was blowing and its effect upon a long car float even though he does say that he was not experienced in handling such car floats. There was nothing to interfere with his vision; the ebb tide was against him while it was with the Akron and her float. To quote: "Its master and owner were thoroughly familiar with the harbor, and with the craft which habitually plied its waters. He knew the steamer was about to go into its slip. He was bound, under the circumstances, to conduct his navigation with reference to such knowledge." The Adriana (C. C. A.) 6 F.(2d) 860, 861.

The statement in The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 252, at page 263, 15 S. Ct. 99, 102, 39 L. Ed. 139, is applicable to such facts: "As it is clear in this case that a collision might have been avoided by prompt and decisive action on the part of the Breakwater, after the Pavonia left the wharf, and that with proper management there was no risk of collision, we think that no fault can be imputed to the latter in leaving at the time she did. * * * The Breakwater knew, or was bound to know, as well as the Pavonia, that the immediate effect of the wind and tide, striking the ferry boat broadside, would cause her to sag down the stream as she passed the outer end of the pier, and was bound to provide against this contingency. This she failed to do effectively."

It is not necessary for me to find that the Port Newark deliberately took a wrong course in view of what was plainly apparent; it is sufficient to find that she could have easily avoided the collision by slowing down or stopping until the Akron had completed her maneuver.

There is nothing to indicate that the Akron was on any course. On the contrary, this case is one of special circumstances.

As has been said by Judge Augustus N. Hand: "It is perfectly settled that the case of a vessel maneuvering to leave her slip is one of special circumstances." The Socony No. 19 (C. C. A.) 24 F.(2d) 653, 654; The Servia, 149 U. S. 144, 13 S. Ct. 817, 37 L. Ed. 681; The John Rugge (C. C. A.) 234 F. 861; The Washington (C. C. A.) 241 F. 952; The Cotopaxi (C. C. A.) 20 F.(2d) 568.

It seems to me, therefore, that the sole fault and proximate cause for this collision was the failure of the captain of the Port Newark to slow down or stop until the Akron with her unwieldy tow had safely executed a maneuver which was not unusual, which could be clearly seen, under weather conditions that were reasonably apparent. The Bulley (C. C. A.) 4 F.(2d) 1004.

Moreover, where I am satisfied that this fault on the part of the captain of the Port Newark is plain, the evidence of the Akron's fault must be clear and convincing. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84.

Therefore I dismiss the libel against the Akron, with costs, and give a decree, in the

usual form, in favor of libelant against the Port Newark.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.