### THE ROCHESTER.
### THE GEORGE F. RANDOLPH.
### THE CARFLOAT.

No. 178.

District Court, S. D. New York.

Feb. 22, 1936.

Macklin, Brown, Lenahan & Speer, of New York City, for libelant.

R. F. Lenahan, of New York City, advocate.

Purdy & Purdy, of New York City, for claimant.

E. Lamb, of New York City, advocate.

HULBERT, District Judge.

A libel was filed in this court on February 5, 1935, by the Baltimore & Ohio Railroad Company, a Maryland corporation, having an office and place of business in New York City, as owner of the tug George F. Randolph, against the tug Rochester owned and operated by the Erie Railroad, an Ohio corporation, to recover damages resulting from a collision in the East river about 300 feet off the Brooklyn shore, just below the Old Fulton Ferry slip on March 9, 1934, about 5:30 p. m.

Trial was had on February 6, 1936.

It was conceded on the trial that the East river, at the point in question, is about 1,300 feet wide from pierhead to pierhead line. Congested traffic; tide running ebb about 3 miles per hour, and weather clear.

The Randolph had taken a carfloat, 284 feet long, on her starboard side at a Wall about Market pier and was proceeding down the East river about 500 or 600 feet astern a Lee & Simmons hawser tow.

The New York Central Tug No. 34, with a barge on either side, was proceeding upstream "on the Brooklyn side of the middle" of the river, bound for Long Island Railroad Terminal (Long Island City).

There was a Berwind & White tow of coal barges following astern of the No. 34 on her port and another New York Central tug engaged in removing two barges from the north side of pier 20 (Manhattan) which is the second pier below the Old Brooklyn Bridge.

The tug Rochester had just pulled a carfloat from its berth on the south side of pier 20 (Manhattan) and lashing it on her starboard side headed upstream. This

carfloat projected from 100–150 feet beyond the bow of the tug and a few feet astern thereof. As the Rochester was bound for the Erie Terminal on the Jersey side of the North, or Hudson, river, she put her wheel hard to port intending to round to and cross the river and proceed down on the Brooklyn side.

It has been repeatedly held that the "Narrow Channel Rule" does not apply between the Battery and Blackwell's (now Welfare) Island, but that the local statute governs. This is frequently referred to as chapter 321 of the Laws of 1848, which was repealed by chapter 42 of the Laws of 1909, the substance of said statute of 1848 having been re-enacted in chapter 410, § 757, of the Laws of 1882, and reads in part, as follows:

"All the steamboats passing up and down the East river, between the Battery and the southern extremity of the city of New York and Blackwell's island, shall be navigated as near as possible in the center of the river, except in going into or out of the usual berth or landing place of such steamboat, and shall not be propelled at a greater rate of speed than eight miles an hour below Corlear's Hook, nor ten miles an hour above Corlear's Hook."

When he first saw the Rochester, the Captain of the No. 34 states that he was about opposite pier 15 Brooklyn; the Captain of the Rochester testified that when he first saw the Randolph off Dock street, Brooklyn, the No. 34 was opposite pier 7, Manhattan. The Rochester then signaled the No. 34 with two blasts of her whistle indicating that she would cross the bow of the No. 34 and make a starboard to starboard passing. The Captain of the No. 34 claims that he did not hear any signal, but that when he saw the Rochester had changed her course and having the tide against him he could stop very easily, and did. At that time he stated the Randolph was up above the Bridge.

The Captain of the Randolph testified that as he approached the Bridge, he was nearer the middle of the river which, at that point, runs in a westerly direction but bends to the southwest. He first noticed the upbound New York Central tow when he came around the bend and, when he was off the "Jay Street Terminal," the Rochester was just taking the carfloat on her starboard side heading upstream.

The Captain of the Rochester testified that he assumed that the destination of the Randolph was pier 21 (Manhattan) and that she would proceed diagonally across the river and pass under the stern of the Rochester. Her ultimate destination was St. George, Staten Island, but she was under orders to stop at pier 21 and pick up another carfloat. Her Captain, however, testified that when she approached the Bridge, the Erie started to round to, as he figured, to go down the river. The Randolph directed her course along the Brooklyn shore because at the existing state of the tide, which sets toward Brooklyn, it was both the proper and customary maneuvering for him to proceed to a point below Fulton street in order to round to and cross the river to get in on the south side of pier 21 and pick up his other float.

The Rochester anticipated no interference from the Lee & Simmons tow which the Captain of the No. 34 testified the Randolph was following about 300 feet in its wake.

The Rochester claims that she was 450 feet out in the river when the Lee & Simmons tow passed and was 300 feet off the Brooklyn shore when the Randolph "overtook her." She claims that when a collision seemed imminent she stopped and reversed her engines and backed within 25 feet of the approaching No. 34.

It seems clear, from the testimony, that the forepart of the Randolph's float safely passed the Rochester. The claim of the latter is that the Randolph put her wheel hard to starboard which swung her bow toward the Brooklyn shore and caused her stern to crash into his tow. The Captain of the No. 34 testified that the Randolph put her wheel hard to port which threw her head toward midchannel and her stern inshore to avoid the Rochester which was headed more upstream than across the river. The Captain of the Randolph testified that he performed this maneuver to lessen the force of the impact, realizing a collision was inevitable. The bow of the Rochester's carfloat struck the Randolph's carfloat about 25 feet from the rear. The Captain of the Rochester testified that "not a cent's worth" of damage was done to his float.

The lookout on the Randolph was not called as a witness but his absence was accounted for by illness. It was stipulated that no comment would be made by reason of the failure to call any of the crew of the Rochester.

The evidence presents a conflicting question of fact to be determined upon the interested testimony of the Captain of each of the tugs involved in the collision and the disinterested testimony of the Captain of the No. 34. While the evidence was clear in my mind, I have had the stenographer read over to me certain portions of the testimony.

It is the contention of the respondent that the Randolph was an overtaking vessel and therefore bound to keep out of the way of the Rochester. But, at no time, as I visualize the position of these floats, according to the testimony, was the Randolph two points abaft the beam of the Rochester (article 24, Inland Rules, section 209, T. 33, U.S.C. [33 U.S.C.A. § 209]), nor was the course of conduct of the Rochester that of an overtaken vessel.

There is no contention that the "Starboard Hand" rule applies. Of course, the situation presented by a vessel coming out of a slip and maneuvering to get on her course is not navigating upon any course and the "Steering and Sailing" rules do not apply. McWilliams Bros., Inc. v. Payne (C.C.A.) 276 F. 917.

This case impresses me as one where the rule of "Special circumstances" governs.

The fault of the Rochester is so obvious that the only question to be determined is whether the Randolph did all that she might and should have done to avoid the collision. The Mauch Chunk (C.C.A.) 154 F. 182 affirming (D.C.) 139 F. 747, certiorari denied, 207 U.S. 586, 28 S.Ct. 255, 52 L.Ed. 352.

The fault of the Rochester is so gross and so fully accounts for the collision that the court does not feel it should be astute to find fault with the navigation of the Randolph. M. J. Rudolph (C.C.A.) 292 F. 740, 743. The rule as there stated is that "where the fault of one vessel is gross, any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor."

In The Great Republic, 23 Wall. 20, 35, 23 L.Ed. 55, the court found nothing in the record to excuse the Republic and also found that the Cleona was not free from fault, but, nevertheless, said: "This fault bears so little proportion to the many faults of the Republic, that we do not think, under the circumstances, the Cleona should share the consequences of this collision with the Republic."

To my mind that is the situation in the case at bar.

It was just as logical for the Rochester to maneuver herself into a position to proceed down the right side of the middle of the river as it was to expect the Randolph to continue on her diagonal course across the river and round to and drop down into the slip on the south side of pier 21; the Captain of the Rochester should have been aware of the fact that an ebb tide favors the Brooklyn shore at that point where the collision occurred and that it would be the logical and proper course for the Randolph to proceed in the wake of the Lee & Simmons tow rounding to under the stern of the No. 34 and the Berwind & White tow into pier 21 and avoid possible conflict with the New York Central tow coming out of pier 20.

The Rochester, in my opinion, forced herself across the bow of the No. 34 instead of waiting to pass under her stern. The Captain of the Rochester observed the Randolph change her course as she approached and passed under the Bridge, but blew no signal. If the Rochester anticipated no interference from the Lee & Simmons tow, her Captain certainly gave inadequate consideration to the position of the Randolph float only 300 feet in her wake and from 200 to 250 feet from the Brooklyn pierhead line.

From the position of the two floats in question, at the time of the collision, it is very apparent that the Rochester occupied a position nearly perpendicular to the course of the Randolph, was waiting for her to pass, misjudged the distance as well as the effect of the force of the tide upon the movement of his tow, and crashed into the Randolph.

Accordingly, there will be a decree in favor of the libelant with the usual reference to a Commissioner to determine and assess the damage, unless the parties agree upon the amount thereof.

If these findings do not conform to Admiralty Rule 46½ (28 U.S.C.A. following section 723), either party may submit findings of fact and conclusions of law on five days' notice to the other.