# THE NEW YORK CENTRAL TUG NO. 2.

# THE NEW YORK CENTRAL TUG NO. 27.

## THE NEW YORK.

District Court, S. D. New York.

June 13, 1940.

Haight, Griffin, Deming & Gardner, of New York City (Henry M. Hewitt and James McKown, Jr., both of New York City, of counsel), for Eastern S. S. Lines, Inc., and another.

Clive C. Handy, of New York City (K. O. Mott-Smith, of New York City, of counsel), for claimant.

HULBERT, District Judge.

The libelant is a corporation organized under the laws of the State of Maine and operates a steamship service for the transportation of passengers and freight from a terminal on the North River, New York, N. Y., to Boston, Mass., daily, except Sunday, around the Battery, through the East River, Long Island Sound and Cape Cod Canal.

On August 11, 1938, the S/S New York, one of the vessels owned and operated by the libelant, steamed out of the slip on the south side of Pier 19, North River, at 5:31 p. m. (D.S.T.) and five minutes later, about 800 or 900 feet off Pier 17, was in collision with a tow owned by New York Central & Hudson River Railroad Company consisting of Carfloat No. 24 and Tug No. 2.

It is the contention of the libelant that another tow, owned by the New York Central consisting of Carfloat No. 8 and Tug No. 27, interfered with the navigation of the S/S New York and in so doing was a causal contributor to such collision.

Libels were filed by the Eastern Steamship Company against the Tugs No. 2 and No. 27. The New York Central & Hudson River Railroad Company claimed for the tugs and filed a cross-libel against the S/S New York for the Carfloat No. 24.

The cost of repairing the S/S New York and the Carfloat No. 24 was agreed upon at $9,700 and $588, respectively.

There will be a decree for the libelant against the Tugs No. 2 and No. 27 and dismissing the cross-libel.

My reasons, based upon the facts as found by me, are:

The S/S New York (Captain McDonough) is 402 feet long, 72 foot beam, and operated with twin screw turbines; the Tug New York Central No. 2 (Captain Van Valkenburg) is 105 feet long, 24.6 foot beam, and Carfloat New York Central No. 24 is 337.2 feet long and 40.1 foot beam; the Tug New York Central No. 27 (Captain Miller) is 110 feet long, 25.6 foot beam, and Carfloat New York Central No. 27 is 366.3 feet long, 38.2 foot beam.

Each carfloat was loaded with railroad freight cars and made fast to the starboard side of the tug in such fashion that about 175 feet of the carfloat projected beyond the bow of the tug.

The piers on the North River, commencing at Battery Place, are numbered from No. 1, consecutively.

Pier No. 17 is 926 feet long; Pier No. 18 is 703 feet long; Pier No. 19 is 842 feet long. The slip between Piers 17 and 18 is 166 feet wide and the slip between Piers 18 and 19 is 186 feet wide and there is a single story shed on each of these piers, outshore

of the bulkhead, which extend to within a few feet of the ends of the respective piers.

August 11, 1938, was a clear day; there was sunshine during the entire hour between 5 and 6 p. m. (D.S.T.) and no question of visibility complicates the case. There was a fresh northwest wind of about 21 miles an hour and a strong ebb tide running between two and two and one-half knots per hour, so that both tide and wind would tend to set a vessel leaving her New York Pier to the southward and eastward.

Tug No. 27 had picked up the Carfloat No. 8 near the bulkhead on the south side of Pier 17 and started out of the slip between Piers 16 and 17 at about 5:30 p. m. bound for Weehawken, New Jersey.

Tug No. 2 had picked up Carfloat No. 24 at Pier 35 East River and had come around the Battery, also bound for Weehawken, New Jersey, and was headed upstream about 800 feet off the Manhattan Pier ends about opposite the Cortland Street Ferry Terminal when it came into the area of this controversy, where the width of the river is 3,300 feet.

Pier 18 is 139 feet shorter than Pier 19, which gave the master of the S/S New York, whose course would be to port in an arc southward, some visual advantage, while Pier 17 is 223 feet longer than Pier 18 and constituted an obstacle to the master of Tug No. 27 whose intended course would be northwest against tide and wind.

At 5:31 p. m. Captain McDonough signaled for slow speed ahead on both engines and then blew a slip whistle blast of 15–30 seconds duration. This did not continue until the ship reached her pier end. As soon as the New York got under way, a northbound Red Star tug towing two scows in tandem was passing just off the pier ends and the New York momentarily stopped her engines at 5:32. This same tow had held up Tug No. 27 which started at slow speed and blew her slip whistle after the tow had passed, the Tug No. 27 being then about midway in the length of her slip. There is some doubt whether either vessel heard the slip whistle of the other, and this may be explained by the fact that some testimony was given that both were blown at the same time.

It was not until the pilot house of the New York passed the end of Pier 18 that Captain McDonough was able—from his position, 50 feet above the water line, to see over the roof of Pier 18 and observe the stack and pilot house windows of Tug No. 27 which had not yet reached the mouth of her slip.

Captain Miller had sent a deckhand to the bow of Carfloat No. 8, where he had taken a position as lookout at the starboard corner. Tug No. 27's tow was about half way out of the slip and proceeding slowly owing to the fact that the hawser tow was passing by and when its last scow had cleared Tug No. 27 picked up more speed. Before the Carfloat No. 8 reached the end of Pier 17, and a few seconds after Tug No. 27 had blown her slip whistle, which did not continue until Pier 17 was no longer an obstacle, the lookout heard a whistle from the New York, variously estimated at from 3 to 15 seconds' duration. About the time this second whistle of the New York was blown, the bow of Carfloat No. 8 emerged beyond the end of Pier 17. The lookout on Carfloat No. 8, who had heard that whistle, and the usual previous preparatory signals, notified Captain Miller (who had also heard that whistle of the New York and made no reply) "All clear." Tug No. 27 thereupon put her engines full speed ahead and her wheel hard right to head up into the tide. As the bow of Carfloat No. 8 protruded about 175 feet into the river, the lookout observed, and notified Captain Miller that the New York was coming out with him but Tug No. 27 continued on full speed until Captain Miller was able to see the New York across the face of Pier 17 and then he decided, in view of the speed he had picked up, to cross the bow of the New York. When the pilot house of Tug No. 27 was clear of Pier 17 her master blew a two-blast whistle accordingly, to which he immediately received from the New York, an alarm signal and a one-blast signal, indicating that the New York would not give way. Captain Miller caused his engines to "back" and "fill," went further out into the stream and drifted down the river with the tide. Meanwhile the lookout had seen Tug No. 2 around Cortland Street when Tug No. 27 and her tow first headed out of the slip, but had not reported it to the master. When Tug No. 2 was approximately off Piers 14 or 15 the lookout heard her blow two whistles to the New York. The master of Tug No. 2 testified that his tug and carfloat were off Pier 13 when he first saw Tug No. 27 and tow "coming out" and about abreast of Pier 14 when he first saw the New York. He heard the slip whistle of Tug No. 27 but not that of the New York. When he first saw the New York he at once slowed down Tug No.

2 to half speed to give the New York more room, expecting a starboard passing. According to his testimony Tug No. 2 and her tow were abreast Pier 15 when he gave a two-blast signal, which the New York answered in kind. He put his wheel hard to left and swung his carfloat out about 100 feet further in the river toward the Jersey shore and then put his wheel hard to right to straighten up his tow, heading into the tide again and signaled for full speed. The New York was facing Tug No. 2 on an angle southerly downstream and, as Captain Van Valkenburg indicated on the diagram (in evidence) her stern had cleared the end of Pier 19. At that time the Tug No. 27 was in a diagonal position upstream pointing to the Jersey shore with her bow above the end of Pier 17.

There are discrepancies in the testimony given by Captain Van Valkenburg on the trial and at a previous investigation conducted by the United States Steamboat Inspection Service. At the trial he testified he slowed down when abreast of Pier 14 because the way the New York was swinging out it looked as though she was going to pass on his starboard, although on redirect he admitted that he slowed down his tow as he was undecided what the New York was going to do, and that he did not blow his first signal to the New York until about abreast Pier 15, and that was to indicate that he intended to go further out into the river to give the New York more room, and that the collision occurred about abreast of Pier 16. On the earlier occasion he testified that the collision took place abreast of Pier 17, about 800 feet outshore and that he gave the first whistle signal to the New York at about Pier 16, which was the time he put his helm hard to left. In any event the New York followed her answering signal with three blasts indicating she was backing at full speed (5:35½) and came in contact with the Carfloat No. 24 about the fourth cleat from the bumper end of the float.

There were introduced in evidence several copies of the New York City Waterfront Improvement Plan showing Piers 13 to 19 drawn according to scale, and there were imposed thereon by the various witnesses, models of the steamer, the tugs and the carfloats, drawn to scale, showing their relative positions at different times.

I have read and analyzed the testimony of those officers and members of the crew of the vessels concerned, as well as those of ferry boats which were plying the river at that time, and the conclusion is inescapable that even if there be fault on the part of the New York it was so slight in comparison to that of the tugs, and particularly Tug No. 2, whose operation I regard as grossly negligent, that the principle of law laid down in Thompson v. The Great Republic, 25 Wall. 20, 35, 23 L.Ed. 55 (see The Rochester, D.C., 18 F.Supp. 51) should be applied.

Whether Rule 19[1] applies with respect to the maneuvering of the New York or whether the case is one of special circumstances under Rule 24[2] does not affect the situation.

It is clear to me that the master of the Tug No. 27 knew, or he should have known, that the New York was scheduled to leave her slip at 5:30 p. m. At that moment the Red Star Tug was passing the slip on the south side of Pier 17 and it is quite evident that the master of Tug No. 27 estimated that before this tow arrived at and passed the slip on the south side of Pier 19 that his tug and tow could get out into the river and be well on its way. If he had exercised the caution of a reasonably prudent person under the circumstances, with the tide in his favor, he would have held his tug and carfloat in a position to have permitted the New York to leave her slip without interference.

The master of Tug No. 2 could readily have avoided the accident (1) by slowing down his engines and stemming the tide when he first observed the relative positions of the Tug No. 27 and the New York, or (2) he could have continued full speed ahead and, at the same time, directed his course toward the middle of the river. When he slowed down his engines but continued under way he put his tow in a position where, because of the maneuvering which the New York was required to do to avoid the Tug No. 27, the collision was unavoidable.

---

[1] 33 U.S.C.A. § 344. "If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

[2] 33 U.S.C.A. § 349. "In construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger."

Submit proposed findings of fact and conclusions of law with notice of settlement, at which time the attorney for claimant and cross-libelant may submit objections, criticisms and suggestions, in writing.