### THE MAY McGUIRL.
### SHAMROCK TOWING CO., Inc., v. PALMER et al.
#### No. 15644.

District Court, E. D. New York.

Nov. 19, 1940.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for libellant.

Duncan & Mount, of New York City (Henry W. Dieck, and William Hecht, both of New York City, of counsel), for respondents.

GALSTON, District Judge.

It is alleged that on the night of April 7, 1939, the tug May McGuirl took the steel barge D. S. No. 23, belonging to the City of New York, in tow and was destined for Riker's Island, New York. The barge was made fast on the port side of the tug. On the way to Riker's Island the tug and tow were to stop at the Department of Sanitation dock at the foot of Roosevelt Street, East River. While the tug and barge were rounding to for the dock at Roosevelt Street, the Transfer No. 17, a tug with a car float in tow on her starboard side was observed proceeding down stream. The libel alleges that two whistles were blown by the May McGuirl to indicate to the Transfer No. 17 that the latter was to pass outside the May McGuirl and between the latter and the Brooklyn shore. The answering whistle was a cross signal of one whistle indicating that the Transfer would attempt to pass between the May McGuirl and the Manhattan pier ends. Other whistles were exchanged with the result that the Transfer continued ahead and a collision occurred between the two tows.

The answer alleges that the Transfer No. 17 was proceeding about 150 feet off the Manhattan shore and when in the vicinity of Manhattan Bridge observed the May McGuirl with her barge bound up the East River about mid-way between the center and the Brooklyn shore, and somewhat to the south of the Brooklyn Bridge. Astern of the McGuirl was a steam lighter with a barge on her port side which overtook the McGuirl in the vicinity of the Brooklyn Bridge. After the steam lighter had passed, the McGuirl started swinging to her port, opening up a red and green light to the Transfer No. 17. The Transfer thereupon signaled with one whistle and received no answer. There followed then an alarm and backing whistles and the McGuirl then showed out her red light and opened only her green light to the Transfer. The answer alleges that the McGuirl continued hauling for the Manhattan shore, that she was a light power tug with a heavily loaded tow, was unable to overcome the strong flood tide, and that as a result she was drifting rapidly broadside up the river with the resulting collision.

The record discloses that with a little foresight by both tugs the accident would readily have been avoided.

The McGuirl is about 85 feet long, 25 feet in beam and drew about 11 feet, having a horse power of about 550. The Department of Sanitation scow, which she had in tow, is about 150 feet long, 25 feet wide and was drawing about 10 feet 4 inches. The Transfer No. 17 was a larger and more powerful tug than the McGuirl, 112 feet in length, with about 1,000 horse power. The heavy car-float was 360 feet in length, 40 feet in beam and drawing about 12 feet of water. It carried 20 freight cars on the night in question.

The McGuirl had left 54th Street, North River, bound for Riker's Island, but destined for an intermediate stop at Roosevelt Street. As she proceeded up the East River, somewhat on the Brooklyn side, the tide was flood. At or near the Brooklyn Bridge the steam lighter Diamond S. passed the McGuirl about 100 or 150 feet on the Manhattan side of the scow. Cushing, who navigated the McGuirl, testified that at the time that the steam lighter was passing him on his port side the McGuirl slowed down and then the McGuirl came around with a hard port wheel to go into Roosevelt Street.

Disregarding for a moment the contradiction in respect to the exchange of whistles, it appears that at about that moment (i. e., as the McGuirl was already rounding to) the master of the McGuirl observed the Transfer coming by the Manhattan Bridge. Cushing admitted that on getting an answer of one whistle to his two-whistle signal the McGuirl nevertheless continued going ahead full speed right up to the time of the collision.

At the time the tide, which had a force of about three miles an hour, was setting towards the Manhattan shore and was therefore with the McGuirl.

■ The difficulty about the McGuirl's position is that despite the statement of the McGuirl's master that he blew two whistles to the New Haven tug, which were answered, as he said, with a one-whistle signal, and his repetition of the two-whistle signal which remained unanswered, the McGuirl captain persisted in cutting to the opposite side of the river and across the bow of the Transfer and her car-float, and always at full speed. The collision took place at a point about 150 to 200 feet from the New York shore, as stated by Cushing, though estimated by Dillon, the mate of the McGuirl, at between 75 and 100 feet. If the McGuirl's contention that she had continued her full speed for 5 or 7 minutes after rounding to be accepted, then it follows that since the river is about 1,400 feet wide in the vicinity of Brooklyn Bridge, she had been able to proceed during that time only a matter of at most 400 or 500 feet. The tide doubtless had a very considerable effect on the rounding to movement. Since the Transfer No. 17 was going down the river and the McGuirl was maneuvering for the New York side, a crossing situation existed which made the McGuirl the burdened vessel, The Bulley, 2 Cir., 4 F.2d 1004.

The master of the Diamond S. 90, which was the vessel that passed the McGuirl in the vicinity of Brooklyn Bridge, witnessed the collision. He said that after he had passed the McGuirl he saw that she was about to round up behind his stern and at the same time observed the New Haven tug with a car-float coming down the river. He noticed that the McGuirl was sagging sidewise up the river and heard the New Haven tug blow one whistle, and then again another single whistle. To these the McGuirl gave no answers. The Diamond S. was bound for Pier 29, East River, which is somewhat north, it is true, of Roosevelt Street Pier, and considerably nearer the Manhattan Bridge, and the master of the Diamond S. determined that it was not safe to cross the Transfer's bow, so he slowed his boat to half speed and let it drift up until he had cleared the Transfer's car-float. To say that a less hazardous situation was presented to the McGuirl is not to relieve her master of fault in persisting on a course which, on his own statement, did not justify him in expecting a star-board passing such as he had signaled for. And thus the rule of "special circumstances" is not applicable. The Rochester, D.C., 18 F.Supp. 51, affirmed, Baltimore & O. R. Co. v. The Rochester, 2 Cir., 87 F.2d 998; The Mount Hope, D.C., 7 F.Supp. 80, affirmed, 2 Cir., 74 F.2d 1013.

■ There remains for consideration the matter of any contributing fault by the Transfer No. 17. Navigation in the East River is governed by the East River Statute, Laws of New York, 1882, Chap. 410, § 757, which requires vessels to proceed as near as possible to the center of the stream. Construction Aggregates Co. v. Long Island R. Co. (The Sandmaster), 2 Cir., 105 F.2d 1009, 1010. Now the Transfer No. 17 was navigating 200 feet off the Manhattan docks, according to the master of the Transfer, and though there was traffic on the Brooklyn side there was no traffic ahead of him on the Manhattan side. When Boles, the master of the Transfer No. 17, first observed the McGuirl, the Transfer was about abreast of Pier 31, East River, and at that time Boles blew one whistle. At that time he observed both the red and green lights on the McGuirl as she was coming across the river. He said that he then slowed his engines to half speed. He said there was no reply to the one-whistle signal. Boles then blew another one-whistle signal and received no reply. He then stopped his engines and with the McGuirl coming on and showing then only a green light, he blew an alarm whistle, and then backing whistles. Boles admitted he had heard a two-whistle signal coming, as he thought, from the Diamond S. and directed to the McGuirl. He said he did not hear any whistles whatsoever from the McGuirl from the time that the Diamond S. passed her, but that before the Diamond S. had passed the McGuirl he had heard a two-

whistle signal, but he did not know which boat was blowing the signal, saying: "I thought it might be the McGuirl and answered by another boat down in that direction." Such testimony is far fram satisfactory. Later, in cross examination, he said he thought it was the Diamond S. that blew the McGuirl two signals.

The master of the Diamond S. testified that he did not at any time exchange any whistles with the McGuirl. Moreover he said that as he passed the McGuirl, the McGuirl gave him no whistles. The most that can be said is that the Transfer No. 17 did not accept the two-whistle signal which he admitted he heard as having been directed to him. Whatever his doubt may have been in respect to the vessel that was signaled by this two-whistle blast, as soon as he saw the McGuirl rounding to, he might well have stopped his engines and reversed.

A disinterested witness in this case, to whose testimony I attach importance, was Hansen, the master of the dump scow which the McGuirl had in tow. He said that the McGuirl blew two whistles when the Diamond S. overtook and passed the McGuirl. The respondent argues that at that time the McGuirl would have been blotted out from the sight of the Transfer, but there is no testimony in the case which supports that contention. It is true that Boles testified that up to within five seconds after he blew his second one-whistle signal the McGuirl showed both the red and green lights to the Transfer; but at the hearing before the steamboat inspectors Boles said that between the time of the blowing of one whistle and the blowing of the second one-whistle, the McGuirl had changed her course and was showing only a green light.

Even if Boles regarded his vessel as the privileged one, apparently he did not stop until five or six seconds before the collision. It has been held that "the so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be 'stopped and backed if necessary, until signals for passing with safety are made and understood.'" Postal S. S. Corp. v. The El Isleo (The Eastern Glade), 308 U. S. 378, 60 S.Ct. 332, 336, 84 L.Ed. 335.

I felt at the trial that both vessels were at fault and as the foregoing opinion indicates I still do.

The libellant may have a decree but the damages will be divided.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion.